Filed 7/11/13  P. v. Westmoreland CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,** | |
| **Plaintiff and Respondent,** | **A127394** |
| **v.** | |
| **PAUL WESTMORELAND,** | **(Contra Costa County** |
| **Defendant and Appellant.** | **Super. Ct. No. 05-051785-4)** |

Paul Westmoreland (appellant) was convicted by a jury of first degree felony murder, second degree robbery, and second degree burglary.  On appeal, appellant contends the trial court erred in admitting his confession and the confession of a codefendant, erred in admitting an autopsy report authored by a nontestifying forensic pathologist, abused its discretion in discharging a juror, and abused its discretion in excluding certain impeachment evidence.  We find no prejudicial error.

## PROCEDURAL BACKGROUND

Appellant was charged by information filed in December 2005 with murder (Pen. Code, § 187)[1] (count 1), second degree robbery (§§ 211, 212.5, subd. (c)) (count 2), and second degree burglary (§§ 459, 460, subd. (b)) (count 3).  The information alleged an

---

[1]  All undesignated section references are to the Penal Code.

1

enhancement for use of a deadly weapon (§ 12022, subd. (b)(1)) in counts 1 and 2 and alleged a felony murder special circumstance in count 1 (§ 190.2, subd. (a)(17)).[2]

In July 2009, a jury found appellant guilty as charged and found true the enhancement allegations. In November 2009, the trial court sentenced appellant to life without the possibility of parole.

On February 5, 2013, this court issued a decision concluding the confession elicited from appellant was involuntary and admission of the confession at trial was not harmless. The People filed a petition for rehearing requesting that this court reconsider whether admission of the confession was prejudicial, in light of a letter from appellant entered into evidence at trial. This court denied the petition and the People filed a petition for review. On May 15, the California Supreme Court granted the petition and transferred the matter to this court with directions to reconsider its decision on the petition for rehearing in light of *People v. Woods* (1923) 190 Cal. 513 (*Woods*). In an accompanying order we grant the petition for rehearing.

FACTUAL BACKGROUND

On the evening of August 19, 2005, a Friday, the victim Francisco Sanchez went to a bar with his friends Andres Jiminez and Gregorio Zuniga. They spent several hours drinking before going to another bar called El Rodeo at around 11:30 p.m.

A female, later identified as Erica Gadberry, approached the men. According to Gadberry's trial testimony,[3] she had gone to El Rodeo that night with a plan to pose as a prostitute and lure a customer to a vacant apartment, where the victim would be robbed by appellant, her boyfriend. Earlier on the evening of August 19, 2005, Gadberry and appellant had entered a vacant apartment in their housing complex by breaking a window. They left the front door unlocked so that Gadberry would be able to reenter the apartment for the robbery. Appellant had a steak knife to scare the victim.

---

[2]   Erica Gadberry was named as a codefendant in the information. (See *infra*, fn. 3.)

[3]   Gadberry told the jury she was testifying pursuant to an agreement under which she pled no contest to voluntary manslaughter, second degree robbery, and second degree burglary, and received a prison sentence of 12 years 8 months.

Gadberry and appellant lived with appellant's mother and his sister, Laquita Richardson, in an apartment complex on Weldon Lane in Bay Point (apartment complex). On August 19, 2005, Gadberry arrived at El Rodeo with appellant and Richardson. Gadberry had told Richardson about the plan and Richardson agreed to go to El Rodeo with her.[4] Appellant went inside the bar but did not sit with or talk to Gadberry. Gadberry spent about an hour in El Rodeo before she spoke to Sanchez. Gadberry asked Sanchez, "Want to have a fiesta?" She wanted him to think she was going to have sex with him. She and Sanchez left the bar to go to the vacant apartment; Gadberry saw appellant drive by as she and Sanchez walked to the apartment complex.

Gadberry took Sanchez to a back room in the vacant apartment, where she helped him remove his pants. He was drunk. Gadberry left the room, saying she was going to get a condom and come back. Gadberry encountered appellant near the living room and said, "He's in the back." Appellant had the steak knife with him.

Appellant went to the back room and then Gadberry heard voices saying "Where's the money?" and "I don't have it." She ran back to the room and told appellant, "His pants are right there." She saw appellant pulling the knife out of Sanchez's chest; Sanchez was grasping his chest and saying, "I'm bleeding." Sanchez did not have a weapon. Gadberry grabbed Sanchez's pants with his wallet inside and ran out of the vacant apartment with appellant following her. Appellant returned to El Rodeo to pick up Richardson.

The next day, August 20, 2005, Sanchez's body, dressed in only underwear and socks, was found laying facedown at the bottom of stairs at the apartment complex. The police found more blood in a vacant apartment approximately 100 yards away from Sanchez; the vacant apartment had a broken window. The police were able to identify the body as Sanchez's by his fingerprints. The investigation led to Jiminez, who described the woman he saw leaving El Rodeo with Sanchez. A bouncer at El Rodeo

---

[4]  Richardson testified appellant took her and Gadberry to El Rodeo, but she denied knowing about the robbery plan.

3

told police he knew someone who matched the woman's description. He said the woman and a female friend were at the bar on occasion, and he had once driven one of them home. He showed the police the building where he dropped her off, which was in the same housing complex where Sanchez died.

A search warrant was obtained for the apartment where Gadberry and appellant lived, and it was served on August 21, 2005, at about 12:50 a.m. Among other persons, officers found Richardson in the apartment and found appellant in bed with Gadberry. Richardson, Gadberry, and appellant were transported to a location where they were interviewed separately. Richardson, who was interviewed first, became hysterical and began crying and ranting. She admitted she saw appellant watching Gadberry talk to a Hispanic male at El Rodeo, and Gadberry left the bar with the Hispanic male.

Gadberry was interviewed next. When shown a photo of Sanchez, Gadberry said she had a drink with him at El Rodeo. She broke down in tears when told Sanchez had been killed. Eventually, she admitted she and appellant were involved in a plan to commit a robbery in a vacant apartment. Her confession, which was described to the jury by one of the interrogators, largely mirrored her trial testimony.

Appellant's interview began at 3:18 a.m. and ended at 4:00 a.m. He eventually admitted there was a plan to pick up a man and bring him to a place where he would be robbed. Appellant insisted he did not intend to kill Sanchez. The jury saw a videotape of portions of appellant's interview.

Based on information provided by Gadberry, the police found Sanchez's pants behind some bushes at the Walnut Creek BART[5] station. Appellant's and Gadberry's fingerprints were found on or around the broken window in the vacant apartment.

In December 2007, while appellant and Gadberry were in custody, Gadberry received a threatening letter from appellant that referred to her as a "snitch."

At trial, Dr. Ikechi Ogan, a forensic pathologist with the Forensic Medical Group in Fairfield, testified that the autopsy of Sanchez was performed by Dr. Brian Peterson.

---

[5]   Bay Area Rapid Transit System.

The Coroner's Division of the Contra Costa County Sheriff's Department has contracted with the Forensic Medical Group to perform autopsies. Peterson was the managing partner of the Forensic Medical Group before being hired by the Wisconsin Medical Examiner's Office. Ogan reviewed the coroner's report prepared by Peterson and the photos documenting the autopsy. Ogan testified he concurred with Peterson's opinion that the fatal injury was a single stab wound on the left side of the chest. The knife penetrated four inches, going clear through the third rib and puncturing the left lung and the heart. Ogan explained that the third rib is one of the heaviest ribs in the human body and opined it would take a great deal of force to cause a knife to pass entirely through the rib. Sanchez had no illegal drugs in his system and his blood alcohol level was .10 percent. Ogan opined that injuries to Sanchez's face, including bruises and a laceration above the left eyebrow, were inflicted while the victim was still alive. The coroner's report authored by Peterson was admitted into evidence.

An expert pediatric hematologist/oncologist testified for the defense that appellant had sickle cell disease and suffered a stroke at the age of two and one-half years. She explained that stroke patients suffer brain damage and have significant intellectual deficits.

## DISCUSSION

I. *Admission of Appellant's Involuntary Confession Was Error, but Harmless*

Appellant contends his "confession was inadmissible because it followed an incomplete *Miranda*[6] warning and not even an implicit *Miranda* waiver, and it was involuntary because of the interrogating officers' false statements and inducements." We conclude the warning was adequate and appellant waived his rights, but appellant's confession was involuntary. However, admission of the confession was harmless beyond a reasonable doubt.

"In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda, supra,* 384 U.S. 436, we

---

6    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence. [Citation.] Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we ' "give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence.' [Citations.]" (*People v. Wash* (1993) 6 Cal.4th 215, 235-236 (*Wash*).) The "voluntariness of [a] defendant's waiver and confession must be established by a preponderance of the evidence. [Citation.]" (*Id.* at p. 236.)

A. *The* Miranda *Warnings Were Adequate*

Appellant first contends the *Miranda* warnings given by the police were inadequate because they failed to inform him he was entitled to counsel *during* questioning.

According to a transcript of the questioning at the outset of appellant's police interview, Detective Shawn Pate admonished appellant as follows: "Being an adult and being here with us, you know you do have the right to remain silent. Anything you say can and will be used against you in court. Do you understand that? [¶] . . . [¶] You know you have the right to an attorney. You have to have an attorney prior to any questioning if you desire. If you can't afford to hire one, one will be represent [*sic*] to you free of charge. Do you understand that?" Appellant briefly nodded his head in response to Pate's questions.

*Wash* is directly on point. There, the defendant was informed, "you have the right to have an attorney present before any questioning if you wish one, if you cannot—if you cannot afford . . . an attorney one will be provided to you at no cost before any questioning begins." (*Wash*, *supra*, 6 Cal.4th at p. 236.) *Wash*'s reasoning is equally applicable here: "*Miranda* holds that a suspect must be apprised, inter alia, that he has the right to the presence of an attorney during questioning, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. [Citation.] Although the warning given to [the] defendant here deviated from the standard form in failing to expressly state that [the] defendant had the right to counsel

6

both before and *during* questioning, we are not persuaded—as [the] defendant's argument implies—that the language was so ambiguous or confusing as to lead [the] defendant to believe that counsel would be provided before questioning, and then summarily removed once questioning began. [Citation.] As the high court has observed, the *Miranda* warnings are 'prophylactic' [citation] and need not be presented in any particular formulation or 'talismanic incantation.' [Citation.] The essential inquiry is simply whether the warnings reasonably ' "[c]onvey to [a suspect] his rights as required by *Miranda*." ' [Citation.] We are satisfied that the warnings given [the] defendant here 'reasonably conveyed' his right to have an attorney present during questioning." (*Id.* at pp. 236-237; see also *People v. Valdivia* (1986) 180 Cal.App.3d 657, 662-664.)

The United States Supreme Court recently considered a similar claim in *Florida v. Powell* (2010) 559 U.S. ___ [130 S.Ct. 1195] (*Powell*). There, the defendant was informed he had " 'the right to talk to a lawyer before answering any of [their] questions' " and " 'the right to use any of [his] rights at any time [he] want[ed] during th[e] interview.' " (*Id.* at pp. 1204-1205.) The high court concluded those warnings were adequate. (*Id.* at p. 1205.) Although the second statement made the warnings in *Powell* clearer than the warnings in the present case and in *Wash*, we do not read *Powell* as effectively overruling *Wash*. That is, we do not read *Powell* as requiring that suspects be told they have the right to use any of their rights at any time in order for warnings to be adequate.

In the present case, appellant was informed he had, without any limitation, the "right to an attorney" and, additionally, that he had the right to an attorney "prior to any questioning." Nothing in the detective's words indicated counsel's presence would be restricted after the questioning commenced. Under *Wash*, the warnings given to appellant reasonably conveyed to him he had the right to an attorney before and during any questioning.

Appellant also contends he was not properly advised an attorney would be provided if he could not afford one because the officer misspoke, stating "If you can't afford to hire one, one will be represent [*sic*] to you free of charge." In context, the

7

warnings reasonably conveyed to appellant that an attorney would be provided to represent him.

B. *The People Established That Appellant Waived His* Miranda *Rights*

Appellant next contends the People failed to show he knowingly and intelligently waived his *Miranda* rights.

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' " when making the statement. [Citation.] The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' [Citation.]" (*Berghuis v. Thompkins* (2010) 560 U.S. ___ [130 S.Ct. 2250, 2260] (*Berghuis*).) "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' [Citations.]" (*North Carolina v. Butler* (1979) 441 U.S. 369, 374-375.)

Appellant appears to focus on the second dimension of the waiver inquiry, whether he waived his rights with awareness of the nature of the rights and the consequences of waiver. Appellant contends there was no showing of a knowing and intelligent waiver because he responded to the detective's question as to whether he understood his rights only nonverbally, with "at best" a "slight" nod of his head. He also points to testimony presented to the trial court regarding his mental deficiencies. In particular, a pediatric hematologist/oncologist testified appellant had sickle cell disease and suffered a stroke when he was under three years of age. The stroke caused permanent neurologic damage; appellant's cognitive impairment was mild to moderate. Moreover, patients with sickle cell disease often show a very poor sense of judgment. A clinical neuropsychologist testified that tests showed appellant had "significant" cognitive impairments; she expected appellant to be slower and have fewer skills.

8

Appellant had an IQ score of 76, which could be considered in the mentally retarded range, although appellant did not appear to have mental retardation. Finally, appellant's mother testified appellant was slower than her other children; he attended school "to the 10th grade" and was in special education classes. On cross-examination, she admitted appellant probably had more than one attorney as a juvenile.

In concluding appellant waived his *Miranda* rights, the trial court reasoned as follows: "In this case the court is fortunate to have the videotaped statements which demonstrate both the demeanor and attitude of the witnesses and the environment in which the statements were made. [¶] Here after . . . Pate provided the warnings and asked [appellant] if he understood, the court viewed [appellant] nodding his head. The nodding of the head coupled with the fact that he proceeded to speak with the detectives and did not ask for an attorney persuades the court that he waived his *Miranda* rights. [¶] . . . [¶] As the videotape clearly shows, [appellant] was prepared to talk to the police. He displayed no emotional weakness. He was not under the influence of alcohol or drugs. He appeared to be streetwise. He did not appear intimidated by the officers or cowed by their presence. [¶] His initial statement that, quote, it wasn't me, unquote, showed that he was willing to speak to the officers. His behavior later in the interview complete with a physical demonstration of the way in which Erica walked back in the master bedroom, as well as the way in which he wielded the knife to stab the victim, further shows his willingness to speak. [¶] . . . [¶] . . . [Appellant's] early stroke and sickle cell anemia did not prevent him from knowingly waiving his rights. And his nonverbal and verbal conduct so demonstrated."

We agree with the trial court's reasoning. The high court recently emphasized that "[t]he prosecution . . . does not need to show that a waiver of *Miranda* rights was express. An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence. [Citation.] . . . [A] waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.' [Citation.]" (*Berghuis*, *supra*, 130 S.Ct. at p. 2261.) That standard was met in this case. Appellant received adequate *Miranda* warnings and, in

9

light of his conduct in the interview and the fact he had been represented by attorneys in the past, there is no basis to conclude he did not understand his rights. As in *Berghuis*, "on these facts it follows that [appellant] chose not to invoke or rely on those rights when he did speak." (*Berghuis*, at p. 2262.)

C. *The Confession Was Involuntary, But Its Admission Was Harmless*

Finally, appellant contends his confession was involuntary because "the interrogators repeatedly assured appellant that if he confessed he would not be sentenced to life imprisonment."

1. Legal Background

" 'The Fourteenth Amendment to the federal Constitution and article I, section 15, of the state Constitution bar the prosecution from using a defendant's involuntary confession. [Citation.] [These provisions require] the prosecution to establish, by a preponderance of the evidence, that a defendant's confession was voluntary. . . . [¶] Under both state and federal law, courts apply a "totality of circumstances" test to determine the voluntariness of a confession. . . . On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review. [Citations.] In determining whether a confession was voluntary, "[t]he question is whether [the] defendant's choice to confess was not 'essentially free' because his will was overborne." ' [Citation.]" (*People v. Holloway* (2004) 33 Cal.4th 96, 114 (*Holloway*).)

" 'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . . Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, "if . . . the defendant is given to understand that he might

10

reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible . . . ." ' [Citation.]" (*Holloway*, *supra*, 33 Cal.4th at p. 115.)

2. Factual Background

Appellant primarily argues his statements were involuntary because detectives assured him he would not be subject to life imprisonment if he confessed to a "robbery gone wrong."[7] Immediately after informing defendant of his *Miranda* rights, Detective Pate told defendant, "Now I got to tell you this, okay? We came to your house for a reason. We've done our homework. All the evidence has come back. All the fingerprints are back. We're all here. [¶] A lot of times things happen that weren't meant to be, okay? Sometimes people go and they attempt to do one thing, something gets all fucked up and goes wrong and they didn't mean do that. That's the important issue here that we need to work out, because your girl's already told me. [¶] She's very upset. She says that it wasn't supposed to happen that way. I believe her, I truly do. Which means that things aren't quite as bad as we thought they were, okay? [¶] Now, I'm gonna give you the opportunity to set your record straight here, okay? 'Cause she's already told the story." Appellant asked, "What did she say?" Pate responded, "What do you think she told me? Basically a robbery went bad, okay? [¶] Now we got all the evidence we need. We came to your house for a reason. The judge has already signed off on all that. Now we need to set the record straight. [¶] Did you all say, 'Hey, fuck it, let's go out and kill somebody tonight' or did something just go bad? And if something went bad, a lot of times there's logical explanations for things. And that's what we're here to work

---

[7]  Appellant also argues his confession was involuntary because "the interrogators repeatedly lied to appellant that his fingerprints had been found inside the apartment where the homicide took place, that his sister had inculpated him, and that his girlfriend might be released." We reject that contention because those deceptions were "not of a type reasonably likely to procure an untrue statement." (*People v. Farnam* (2002) 28 Cal.4th 107, 182 (*Farnam*).)

11

through, okay?  [¶] Don't portray yourself as some bad guy that went out to do one thing when you didn't."

After further informing appellant of evidence the police had gathered against him, the following exchange occurred:

"[Pate]:  Obviously we know what time it is.  Now we're past that.  You need to get past that.  You're a smart young man.  You don't have much criminal history, correct?

"[Appellant]:  Check it out, yeah, correct.

"[Pate]:  Don't go hemming yourself up on a life case when it doesn't need to be.

"[Appellant]:  That's where I'm at.

"Detective Barnes:  Let me, let me — let me — explain another thing, too.

"[Appellant]:  I'm not going to get life anyway?

"[Pate]:  No."

Shortly thereafter, the following exchange occurred:

"[Pate]:  So at this juncture, at this point in your life is where honesty is everything.  [¶] You have a gentleman that went out to have a good time.  He's a business owner with family.  Something went bad.  Maybe you just wanted to get something.  Something went wrong and he's no longer with us.  He's dead.  [¶] We're homicide detectives, okay?  So now we need to figure out how it went bad.

"[Appellant]:  Yeah, but check this out.  I'm gonna get life for it?

"[Pate]:  No, that's not what I said.

"[Appellant]:  How you know I'm not gonna get life?

"[Pate]:  Well, at this point in the investigation, we're going by what our evidence [says] and what she says.  I'm not even gonna get into what you may or may not get.  [¶] . . . [¶] There's all kinds of variables in that.  If you just had got up in the morning and said, hey, fuck it, I'm gonna go murder someone because I'm a killer like that, then you might get life.  [¶] But if there's logical explanations for some of the actions that happened and there's a reason why, maybe the guy did something else and provoked something or who knows.  That's why I'm here to let you set the record straight.  [¶] So

12

it's hard for me to tell you what you may or may not get. . . . [¶] Why did this one go bad? I'm not gonna sit here and feed you my entire investigation because I need to know these things from you. That's the only thing that's gonna help you out. And you need to think of this, think this through because this is a huge point in your life. [¶] You're in trouble, I'll be honest with you. But how much trouble you're in it depends on you. It truly does. It depends on is this jury gonna see you as a young man that feels sorry that something went wrong and that's not what [he] intended to happen, or is this jury gonna see a man that says, fuck it, I went out and killed somebody and this is why."

"[Appellant]: I ain't like that.

"[Pate]: There you go. This is your opportunity to tell it. If it went bad it went bad. But you got to lay it out for us. [¶] Your girlfriend's scared. She laid it out. She's very remorseful. She feels sorry for what happened. That is gonna weigh on the decisions that are made. [¶] Is there remorse or is there no remorse?"

Thereafter, appellant asked Pate and Barnes what would happen to Gadberry and he asked them for a cigarette. Pate said appellant could have a cigarette "as soon as we're done talking" and then he started to walk appellant through the events of the evening of the killing, starting with the trip to the bar. Appellant gave brief answers that are unintelligible on the video of the interrogation, and Pate said, "This is getting into the corroboration thing. This is where your honesty is what will help you, okay? So when she says we went straight to this house or that house — ." Appellant interrupted Pate and stated, "I'm gonna get life in prison." Pate responded, "You got to get past that, man," and appellant said "Shit don't matter man, I'm gonna get life."[8] Pate responded, "That's not necessarily true, my friend." Shortly thereafter, Pate asked appellant, "Why did it go bad? I mean you've gotten money before without anybody getting hurt. Did this guy

---

[8] These last two references by appellant to a potential life sentence are not recorded in the transcript, which indicates appellant's comments are "unintelligible." In its review of the video of the interrogation, this court heard appellant make the statements as indicated herein. We asked the parties to comment on these statements and, in supplemental briefing, neither party disagreed that they were made.

13

attack you?  Did he disrespect you?  [¶] Give me some logical explanation for what happened here."  Appellant then confessed his involvement in the killing for the first time, stating, "Just went bad."  Shortly thereafter, he stated, "I didn't mean to kill the man," and explained the victim got stabbed in a struggle.

3.  Analysis

In assessing whether there were false promises of leniency that rendered appellant's confession involuntary, the decision in *People v. Cahill* (1994) 22 Cal.App.4th 296 (*Cahill*) is instructive.  There, the defendant was convicted of first degree murder with special circumstances that the murder occurred in the course of a burglary, robbery, and rape.  (*Id*. at p. 300.)  After the defendant was given a "*Miranda* warning," the police told him they had all the physical evidence they needed to place him in the victim's house where the murder occurred.   (*Id*. at p. 303.)  An officer told the defendant, " 'I'm here really to try to see what I can do for you.' "  (*Id.* at p. 305.)  The officer provided a "materially deceptive" explanation of the law of murder in California, describing first degree and second degree murder and voluntary manslaughter, but omitting any reference to felony murder. (*Id.* at pp. 306, 315.)  The officer told the defendant he could help himself by talking and suggested the defendant could avoid a first degree murder conviction by admitting an unpremeditated role in the killing.  (*Id.* at pp. 306-307, 314-315.)  *Cahill* found the defendant's subsequent confession was procured by a false promise of leniency—that he could avoid first degree murder by admitting to the killing but stating it was not premeditated.  (*Id.* at p. 314; see also *People v. Johnson* (1969) 70 Cal.2d 469, 479.)  Recognizing the case law that deception is permissible unless reasonably likely to procure an untrue statement, *Cahill* found those cases did not apply where the deception was a false promise of leniency.  (*Cahill*, at p. 315.)

The People rely on *Holloway* to argue the confession was voluntary.  But, the California Supreme Court in *Holloway* implicitly agreed with the reasoning of *Cahill*, stating that the case was "distinguishable factually."  (*Holloway*, *supra*, 33 Cal.4th at p. 117.)  *Holloway* explained that the detective in *Cahill* "led the defendant to believe he

14

could avoid a first degree murder charge, in a burglary-murder case, by admitting to an unpremeditated role in the killing." (*Holloway*, at p. 117.) In contrast, the detectives in *Holloway* "gave [the] defendant no such misleading assurances. No specific benefit in terms of lesser charges was promised or even discussed, and [a detective's] general assertion that the circumstances of a killing could 'make[] a lot of difference' to the punishment, while perhaps optimistic, was not materially deceptive." (*Ibid.*; see also *id.* at p. 116 ["To the extent [the detective's] remarks implied that giving an account involving blackout or accident might help [the] defendant avoid the death penalty, [the detective] did no more than tell [the] defendant the benefit that might ' "flow [] naturally from a truthful and honest course of conduct" ' . . . ."].)

The present case is more like *Cahill* than *Holloway*. On several occasions, Pate told appellant that his admission to killing the victim during a robbery would not, by itself, trigger a life sentence. Due to the felony-murder rule, this was false. (See §§ 189, 190.2, subd. (a)(17)(A); see also *People v. Chun* (2009) 45 Cal.4th 1172, 1182.)[9] Pate repeatedly asserted appellant *could* avoid a life sentence if appellant provided an explanation for the murder that did not reflect premediatation. For example, Pate stated, "If you just had got up in the morning and said, hey, fuck it, I'm gonna go murder someone because I'm a killer like that, then you might get life. [¶] But if there's logical explanations for some of the actions that happened and there's a reason why, maybe the guy did something else and provoked something or who knows. That's why I'm here to let you set the record straight." Similarly, he told defendant "Don't go hemming yourself up on a life case when it doesn't need to be." Pate also repeatedly emphasized that the interrogation was the critical opportunity for appellant to help himself by being honest and showing remorse. In the language of *Holloway*, Pate "led [appellant] to believe he

---

**9**   Section 190.2, subd. (a)(17)(A) provides: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if . . . : [¶] (17) The murder was committed while the defendant was engaged in . . . the commission of, attempted commission of . . . : [¶] (A) Robbery . . . ."

15

could avoid [a life sentence] by admitting to an unpremeditated role in the killing." (*Holloway*, at p. 117.)

Finally, it is clear that Pate's false promises of leniency caused appellant to confess. (See *Cahill*, *supra*, 22 Cal.App.4th at p. 316 ["An implied promise of leniency must be 'a motivating cause of the confession.' "].) Appellant repeatedly expressed concern he would be sentenced to life in prison if he admitted to killing the victim, and Pate repeatedly attempted to assuage that concern by telling appellant that whether he would be sentenced to life depended on appellant's explanation of why he killed the victim. Indeed, immediately before appellant confessed his involvement, appellant was expressing concern he would be sentenced to life regardless of what he said, and Pate responded, "That's not necessarily true my friend." No other circumstances undermine the implication that Pate's false promises influenced appellant's decision to confess. We conclude that, under *Cahill*, the defendant's confession was involuntary, obtained in violation of appellant's Fifth Amendment privilege against self-incrimination.

4. Prejudice

Because appellant's confession was obtained in violation of the Fifth Amendment to the United States Constitution, his conviction must be reversed unless the error in admitting his confession was harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 295 (*Fulminante*); *Chapman v. California* (1967) 386 U.S. 18, 23; see also *Cahill*, *supra*, 22 Cal.App.4th at p. 318.) We review the record de novo and the People bear the burden of demonstrating that admission of the confession did not contribute to the conviction. (*Fulminante*, at pp. 295-296.) In conducting our prejudice review, we bear in mind that "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury . . . .' [Citations.] While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in

16

which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision." (*Id.* at p. 296; see also *People v. Cahill* (1993) 5 Cal.4th 478, 503; *People v. Gonzalez* (2012) 210 Cal.App.4th 875, 884.)

Here, the People argued in their brief on appeal the error was harmless because "[t]he jury heard Gadberry's testimony and watched a video of her police interview. Her account of the events was corroborated by recovery of Sanchez's clothing at the Walnut Creek BART station. Appellant's and Gadberry's fingerprints were found on the broken window in the apartment where Sanchez was stabbed. Richardson confirmed that Gadberry left the bar with Sanchez." In our original decision, we found those arguments to be unpersuasive. The facts that the police found Sanchez's clothes where Gadberry said they would be and Richardson confirmed that the victim left the bar with Gadberry were equally consistent with either Gadberry or appellant killing Sanchez. The fact that appellant's fingerprints were on or around the broken window certainly suggested his involvement in the robbery, but it was a reasonable possibility that appellant was in the apartment at some other moment unrelated to the robbery. The People's fingerprint examiner admitted on cross-examination that fingerprints can remain on an object for weeks or more.

In a petition for rehearing, the People argued admission of the confession was harmless in light of a letter admitted into evidence at trial, People's Exhibit 54A. On its face, the letter appears to have been written by appellant and sent to Gadberry following appellant's arrest on the present charges. In the letter, appellant admits he was the person who killed Sanchez. Among other things, he states, "But I'm hoping for manslaughter or self defense. Either one will be good for me. You don't have to worry as much as me. Because I'm the one who did it." He asks Gadberry to provide her lawyer with a justification for his acts, without ever suggesting that the justification is true: "When you talk to your lawyer, tell him or her that the Mexican beat me up and I defended myself. Please tell them that it was self defense." At trial, a forensic document examiner testified appellant was the person who wrote the letter, and it was admitted into evidence over

17

appellant's objection. At the end of her closing argument, the prosecutor relied on the letter, including appellant's admission that he killed Sanchez, and encouraged the jury to read the letter. She argued, "This letter alone with the body of . . . Sanchez is enough to prove this case without any assistance from . . . Gadberry."

Although the People presented the letter to this court for the first time in its petition for rehearing, this court is obligated to consider the letter in considering whether admission of the confession was harmless beyond a reasonable doubt. (*Woods*, *supra*, 190 Cal. at pp. 517-518.) In response to the petition for rehearing, appellant argued that admission of the confession was prejudicial even in light of People's Exhibit 54A, although he did not explain why, other than to assert that the confession was weightier evidence against him. Appellant has not submitted a brief following the Supreme Court's transfer of this case with directions to reconsider in light of *Woods*.

On the merits of the issue, we note that appellant's admissions were broader in his confession than in the letter; specifically, in the confession he admitted the killing occurred during the course of a robbery, while in the letter appellant simply admitted he killed Sanchez without explaining the circumstances. Nonetheless, People's Exhibit 54A provided strong corroboration for Gadberry's testimony. Appellant does not argue that, absent the confession, there is any likelihood the jury would have concluded Gadberry was telling the truth in testifying that appellant killed Sanchez, but she was lying in testifying that it occurred during a robbery. There is no persuasive reason to conclude she was lying in that part of her testimony, because the testimony implicated her in the robbery. We conclude the People have met their burden of showing the error in admitting appellant's confession was harmless beyond a reasonable doubt.

II. *The Trial Court Properly Admitted Gadberry's Statement to the Police*

Appellant contends Gadberry's statement to the police should have been excluded because it was the product of police coercion.[10] The claim is without merit.

---

[10] Though appellant discusses Richardson's police interview under the "Factual Summary" in his opening brief, he does not argue that admission of Richardson's testimony violated his due process right to a fair trial.

18

While appellant lacked standing to seek to exclude Gadberry's police statement on the ground that it was obtained in violation of her Fifth Amendment privilege against self-incrimination (*People v. Badgett* (1995) 10 Cal.4th 330, 343 (*Badgett*)), he did have standing to challenge the admissibility of the statement on the ground it was obtained by coercion (*People v. Lee* (2002) 95 Cal.App.4th 772, 781 (*Lee*)).  (See also *Badgett*, at p. 347 ["the primary purpose of excluding coerced testimony of third parties is to assure the reliability of the trial proceedings"].)  "[Where], as here, the facts regarding the alleged coercion are not in dispute, we . . . review the record de novo to determine whether, based on the totality of the circumstances, [Gadberry's] statement was voluntary."  (*Lee*, at p. 781, fn. omitted.)  Appellant bears the burden of proving coercion.  (*Badgett*, at p. 348.)[11]

Appellant's primary argument is the police made implied threats Gadberry would be subject to the death penalty if she did not make a statement implicating appellant. However, a confession will not be considered involuntary " 'simply because the possibility of a death sentence was discussed beforehand' [citation], but only where the confession results directly from the threat such punishment will be imposed if the suspect is uncooperative, coupled with a 'promise [of] leniency in exchange for the suspect's cooperation' [citation]."  (*Holloway*, *supra*, 33 Cal.4th at p. 116.)  *Holloway* held that, to the extent the officer's "remarks implied that giving an account involving blackout or accident might help [the] defendant avoid the death penalty, he did no more than tell [the] defendant the benefit that might ' "flow[] naturally from a truthful and honest course of conduct" ' [citation], for such circumstances can reduce the degree of a homicide or, at the least, serve as arguments for mitigation in the penalty decision."  (*Ibid.*)  Here, at one point, the police stated to Gadberry in describing the robbery-murder, "Do you understand that's a death penalty case?"  They also made statements suggesting a jury might view her more favorably if she told the truth and made it clear she did not intend

_____

[11]  To the extent appellant contends Gadberry's *trial testimony* should have been excluded, that claim fails because appellant has not shown the testimony itself was the product of coercion.  (*Badgett*, *supra*, 10 Cal.4th at pp. 344, 347-348.)

19

for the victim to be murdered. These statements did not render the statement involuntary under *Holloway*.

Furthermore, contrary to appellant's argument, the police did not promise Gadberry she would be released if she confessed. And the deception employed by the detectives during the interrogation was "not of a type reasonably likely to procure an untrue statement." (*Farnam*, *supra*, 28 Cal.4th at p. 182.)

The trial court did not err in refusing to exclude Gadberry's police statement.

III. *Admission of the Autopsy Report Did Not Violate the Confrontation Clause*

Appellant contends he was "denied his federal and state constitutional rights to confrontation and a fair trial by the trial court's admission of the autopsy report and the testimony of a pathologist who was not present at the autopsy of the victim." We disagree.

A. *Factual Background*

As explained previously, Peterson performed the autopsy on Sanchez and prepared an autopsy report, but he was working for the Wisconsin Medical Examiner's Office at the time of trial. When he performed the autopsy, Peterson was the managing partner of the Forensic Medical Group in Fairfield. At trial, the prosecution presented expert testimony regarding the Sanchez autopsy from Dr. Ogan, a forensic pathologist with the Forensic Medical Group. Defense counsel unsuccessfully objected to Ogan's testimony on confrontation clause grounds. Ogan told the jury he had reviewed the autopsy report prepared by Peterson and the photos documenting the autopsy. Based on the report and photographs, Ogan described the condition of Sanchez's body in detail, both externally and internally, including the presence or absence of alcohol and other drugs in his system. He expressed agreement with Peterson's conclusion the cause of death was a single stab wound to the chest. He also provided his opinion on various matters, including that certain facial injuries were inflicted while Sanchez was still alive. The autopsy report was admitted into evidence over defense counsel's objection. Following his conviction, appellant moved for new trial on the grounds that Ogan's testimony and the autopsy report should have been excluded. The trial court denied the motion.

20

B. *Analysis*

The confrontation clause states, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the high court interpreted this provision to bar "testimonial" hearsay unless the out-of-court declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*Id.* at p. 59; see also *People v. Dungo* (2012) 55 Cal.4th 608, 616 (*Dungo*).) *Crawford* explained that the Sixth Amendment's confrontation right pertains to those who give "testimony," defined as " '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " (*Crawford*, at p. 51.) But *Crawford* did not adopt a particular definition of "testimonial." (*Id.* at p. 52; see also *Dungo*, at p. 616.)

In three post-*Crawford* cases, *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705] (*Bullcoming*), and *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221] (*Williams*), the high court has addressed the admissibility under *Crawford* of out-of-court statements contained in forensic analyst reports, when the analyst who prepared the report does not testify.

Following *Williams*, in *Dungo, supra,* 55 Cal.4th 608 and *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*) our Supreme Court attempted to distill guiding principles from the high court's jurisprudence in this area. Given the nature of appellant's *Crawford* claim, however, it is unnecessary to sort through all of the intricacies of the *Dungo/Lopez* analysis.

In most respects, Ogan's testimony related to issues, like the cause of death, which were undisputed. Appellant's claim of prejudicial error is, in fact, limited to one aspect of the pathologist's testimony: Ogan's conclusion that the victim's facial injuries were inflicted premortem. Appellant argues, "[t]he inference from Dr. Ogan's testimony was that appellant had hit Sanchez in addition to stabbing him and therefore they had a greater conflict and appellant's actions were intentional." Because a homicide detective who

21

was present at the autopsy testified Peterson said this injury was inflicted "postmortem," appellant contends he was prejudiced by Ogan's contradictory testimony.[12]

We conclude that under *Dungo* no confrontation clause violation occurred, because none of the autopsy information Ogan relied on was testimonial. Ogan's challenged opinion was based on photographs of the facial injury taken during the autopsy and Peterson's comments regarding his observations of that injury contained in the autopsy report. Peterson's statements in the autopsy report are not testimonial. (*Dungo, supra,* 55 Cal.4th at p. 621 [pathologist's observations in an autopsy report regarding the condition of a victim's body are not testimonial].) In addition, the photographs are not hearsay. Hearsay is an out-of-court "*statement* that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a), italics added.) A "statement" is oral or written verbal expression or nonverbal conduct of a *person* that is intended to be a substitute for oral or written verbal expression. (Evid. Code, § 225.) The autopsy photographs are not "verbal expressions," nor is a camera a "person." (See *Lopez*, at p. 583.) Because they are not statements, the photographs are not testimonial. In any event, even if the photographs were statements, they would not be testimonial for the same reason that Peterson's comments about the facial injuries in the autopsy report are not testimonial. No Sixth Amendment violation has been shown.

IV. *The Trial Court Did Not Abuse Its Discretion by Discharging a Juror*

Appellant contends the trial court violated his right to a fair trial by discharging Juror No. 118, who sat in the jury box as Juror No. 7. We disagree.

A. *Background to Removal of Juror*

During Gadberry's testimony, the trial court, outside the jury's presence, said to both counsel that Juror No. 118 was "having some severe problems with staying awake." The court stated, "He is not only perpetually yawning and facing his chair away from the

---

[12] Though appellant states repeatedly in his reply brief that Peterson's "postmortem" conclusion is contained in his autopsy report, that is not accurate.

witness, but several times today I've caught him with his eyes closed — [¶] . . . [¶] — on crucial testimony.  [¶] So I want to talk to him about what the problem appears to be.  If it's an issue of maybe the blinds need to be drawn or if he's working late or whatever it is.  [¶] . . .  [¶] But we can't have that."

The court then spoke directly to Juror No. 118, referencing his difficulty staying awake and asking what the problem was.  He replied, "It's just been a very hot day. . . . I . . . went for an extended walk, and it was very, very hot. . . .  [I] was trying to pay attention to the testimony being given at the time.  It was becoming a little — unfortunately, some of the more fine aspects that were not I didn't think germane or key critical at that particular moment tended to have my focus wander, or I allowed myself to wander in my concentration."  He admitted, "I think I fell asleep briefly for one point." He explained it was during the portion of Gadberry's testimony "where she was — they were trying to determine the screen and whether or not — how it was removed."  The court asked the juror if closing the blinds would be helpful to him and he said yes.  The court also took into consideration the juror's request that a fan be moved.

Subsequently, during Ogan's testimony, the court, out of the jury's presence, stated it had received information about Juror No. 118 from Deputy Wolfe, who was assigned to appellant's courtroom during jury selection but was not assigned to the courtroom at the time.  Wolfe told the court that Juror No. 118 had made contact with him that day and the day before.  The court told counsel it was "concerned that somehow (Juror No. 118) may have established some affinity with Deputy Wolfe, and it leads to a concern that he may lean one way or the other because of these interactions which appear to be odd at best."  The court stated it intended to discuss the matter with Juror No. 118 but it was inclined not to allow him to remain a juror "given the fact that he slept during previous testimony, that he's already had improper contact with Christopher Bowen, and now he's had two days worth of contact with Deputy Wolfe . . . ."

Deputy Wolfe told the court under oath that Juror No. 118 approached him the day before at a coffee shop.  Juror No. 118 was standing in line directly behind the deputy and said, "I recognize you from before.  You're a good bailiff.  We miss you in there.  I

23

have a question to ask you." Deputy Wolfe told the juror he could not answer any questions, he was on his lunch break, and Juror No. 118 needed to leave. A similar encounter occurred the next day. Juror No. 118 approached Wolfe at a table in the same coffee shop and said, "Hey, I need to ask you a question. Can I raise my hand and ask questions during the trial?" Wolfe told the juror he could not answer the question and the juror should ask his question to the bailiff in the courtroom. Juror No. 118 was summoned to the courtroom and asked to explain the contact he had with Deputy Wolfe on the day before and on that day. Juror No. 118 said on the day before he made brief "chitchat" with Deputy Wolfe, telling the deputy he was "a funny bailiff." The juror said that the next day (the day of the hearing) he asked Wolfe what was the proper procedure to follow if a juror had a question.

After the questioning, defense counsel argued the juror should not be discharged because "the contacts were relatively innocuous." The prosecutor deferred to the trial court on whether to discharge the juror. The court decided to discharge Juror No. 118, reasoning: "I am very concerned about (Juror No. 118) in the sense that the court has already had several conversations with him—well, with the panel as a whole regarding not to have contact with parties involved in this matter. So that's the one concern. [¶] But we have had him here before because he's been asleep, which he admitted. And he admitted he was sleeping because he didn't find some testimony to be, quote, unquote, germane, which as we all know is certainly not a decision he can make at this particular point. He's required to listen to all the testimony. [¶] Secondly, Mr. Bowen reported contact by (Juror No. 118) with him at the end of the day at the conclusion of Ms. Gadberry's testimony. [¶] And now there are two contacts, yesterday and today, with Deputy Wolfe who is not assigned to this department, who is currently in trial in Department 12 as the assigned bailiff there, and whose version of the contact is somewhat different from (Juror No. 118's). I do credit Deputy Wolfe's description of the contact. [¶] And my concern is, is that somehow (Juror No. 118) may have some alignment with Deputy Wolfe which could be a concern as a deliberating juror in this matter. [¶] So I understand, [defense counsel], that you think he should sit. And I

24

understand, [prosecutor], you will just submit it to the court, but it's my intention, given the totality of the circumstances before me, to excuse him."

The court also directed the bailiff to dispose of the juror's trial notebook, stating, "And for the record, Deputy Moreno is going to be disposing of this notebook, because repeatedly during this trial — and I don't know if counsel have noticed it — he has had the notebook in his mouth. [¶] . . . [¶] And using it in some very bizarre gestures. And so that notebook is being disposed of as we speak."

B. *Analysis*

Penal Code section 1089 authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror "is found to be unable to perform his or her duty." (See also Code Civ. Proc., § 233 [trial court may order discharge of juror who is unable to perform his or her duty].) A juror's inability to perform as a juror " ' " 'must appear in the record as a demonstrable reality.' " [Citation.]' [Citation.]" (*People v. Cleveland* (2001) 25 Cal.4th 466, 474.) The trial court's ruling is reviewed for abuse of discretion. (*Ibid.*)

In *People v. Bonilla* (2007) 41 Cal.4th 313 (*Bonilla*), the Supreme Court indicated that sleeping during trial may constitute good cause to discharge a juror. There, one juror submitted a note advising the court that, "due to an extended night shift work schedule, he had 'drifted off to sleep a couple of times this past week.' " (*Id.* at p. 350) The court had not observed the juror sleeping. (*Id.* at p. 351.) On further inquiry, the juror informed the court and counsel that he did not think he had missed any testimony because he caught himself when he started to nod off. (*Ibid.*) The trial court declined to discharge the juror, but it did discharge another juror based on testimony from defense witnesses that they had seen the other juror sleeping. (*Id.* at p. 352.) *Bonilla* indicated that discharge of the juror who had been witnessed sleeping was "supported by the evidence." (*Id.* at p. 350.)

In the present case, during the testimony of Gadberry, the key witness, the trial court observed Juror No. 118 "perpetually yawning and facing his chair away from the witness," and "several times" the court caught him "with his eyes closed . . . on crucial

25

testimony." (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1349 [juror inattentiveness is generally not a basis for new trial motion " 'in the absence of convincing proof that the jurors were actually asleep during material portions of the trial. [Citations.]' [Citation.]"].) Although the court did not immediately decide to discharge the juror due to his inattentiveness, his inattentiveness during Gadberry's testimony provides sufficient support for the court's discretionary decision to discharge the juror. In light of that conclusion, we need not decide whether the juror's contacts with Deputy Wolfe separately support the implied finding that Juror No. 118 was unable to perform his duty.

V. *The Trial Court Did Not Err in Excluding Certain Impeachment Evidence*

Appellant contends the trial court violated his constitutional right to present a defense by excluding "relevant impeachment evidence regarding crucial prosecution witness" Gadberry. We reject the claim.

A. *Background*

During defense counsel's cross-examination of Richardson, the trial court sustained relevance objections to a number of questions intended to impeach Gadberry's credibility. Counsel asked who was the more controlling and more mature person in Gadberry and appellant's relationship, and counsel asked if Richardson had an opinion about Gadberry's reputation for honesty. Outside the jury's presence, defense counsel argued that Gadberry, by testifying about appellant's "violence and his sexual depravity,"[13] had "put into issue the question of who was controlling that relationship." Counsel also said Richardson had seen Gadberry "acting in the role of prostitution" on another occasion, which would impeach Gadberry's credibility because prostitution is a crime of moral turpitude.

---

[13] Gadberry testified she went along with the plan to rob a customer from El Rodeo because she wanted to stop appellant from abusing her. Appellant beat her because she would not agree to rob her ex-boyfriends. He hit her with his fist and sticks. She received bruises to her legs and black eyes once or twice a month from 2004 to 2005. She also testified that appellant made her put a screwdriver into her vagina.

Defense counsel made an offer of proof. Richardson would testify she saw Gadberry late at night in an area known for prostitution. Another witness would testify that on at least two occasions Gadberry was seen on a street corner in Fairfield in an area known for prostitution. They would also testify Gadberry had a reputation for dishonesty. Richardson would testify Gadberry told a man she had "used" him after she had sex with him. Finally, Richardson would testify Gadberry was the more mature and controlling person in her relationship with appellant, and that appellant would go to a shoe store where Gadberry worked "and simply sit there and watch her while she worked for hours on end on multiple occasions."

The court ruled that much of the proffered evidence was inadmissible hearsay. Furthermore, the proffered evidence was more prejudicial than probative, it was time-consuming, and it had the potential to confuse the jury. However, the court would allow evidence that Gadberry was present late at night in an area known for prostitution. Subsequently, Richardson testified on questioning by defense counsel that she saw Gadberry late one night in approximately March 2005 standing in an area known for prostitution. Richardson asked her what she was doing there and Gadberry replied that she was waiting for her aunt to get off work, but Gadberry did not have an aunt working in that area.

Later, after all the witnesses had testified, defense counsel offered into evidence a letter purportedly written by Gadberry and found by the bailiff in a magazine possessed by Gadberry around the time of her testimony. Counsel argued that the letter, addressed to someone other than appellant, showed that Gadberry had "moved on to another paramour of interest other than" appellant. Counsel argued the letter would impeach Gadberry's testimony she still had personal feelings for appellant. The prosecutor argued the fact that Gadberry may be in a relationship with another person four years after her relationship with appellant was not relevant to her credibility. The court largely excluded the proffered evidence, reasoning: "I do think it's relevant in terms of her credibility that she wrote a letter and placed it in a magazine, which is in violation of jail policy. That impacts on her credibility. [¶] Whether or not she has moved on in her relationship . . . [,]

27

I don't think that's relevant for purposes of this hearing. But I do think the fact of the letter is relevant. [¶] So if the two of you can prepare a stipulation to that effect, that will be admitted." The parties cite to nothing in the record reflecting that any such stipulation was offered to the jury.

B. *Analysis*

"The principles governing the admission of evidence are well settled. Only relevant evidence is admissible [citation], 'and all relevant evidence is admissible unless excluded under the federal or California Constitutions or by statute. [Citations.]' [Citation.] 'The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' [Citation.] In determining the credibility of a witness, the jury may consider any matter that has a tendency in reason to prove or disprove the truthfulness of his [or her] testimony at the hearing, including but not limited to: a witness's character for honesty or veracity or their opposites; the existence or nonexistence of a bias, interest, or other motive; his [or her] attitude toward the action in which he [or she] testifies or toward the giving of testimony; and his [or her] admission of untruthfulness. [Citation.] Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach, subject to the court's discretion under Evidence Code section 352. [Citation.] . . . [¶] The trial court has broad discretion in determining the relevance of evidence. [Citation.] We review for abuse of discretion a trial court's rulings on the admissibility of evidence. [Citations.]" (*People v. Harris* (2005) 37 Cal.4th 310, 337.)

The trial court properly exercised its discretion in permitting some but not all of the evidence proffered by the defense to impeach Gadberry. The court allowed the defense to introduce Richardson's testimony she saw Gadberry possibly engaged in soliciting customers for prostitution, as well as a stipulation that Gadberry had violated jail policy with respect to letters. The court properly concluded other evidence was irrelevant, including that Richardson thought Gadberry was more dominant and mature, that Gadberry said she had "used" a man with whom she had sex, that appellant watched

28

Gadberry as she worked, and that Gadberry had moved on to another romantic interest. Even if this and other proffered evidence had some minimal relevance, the court properly excluded the evidence under Evidence Code section 352, because it could reasonably have concluded that any minimal probative value was outweighed by the possibility of jury confusion and excessive consumption of time.  On appeal, appellant fails to demonstrate error with respect to any specific piece of proffered impeachment evidence.

In sum, the trial court did not abuse its discretion in its rulings regarding the proffered Gadberry impeachment evidence.  Moreover, the trial court's proper exercise of its discretion did not impermissibly infringe on appellant's right to present a defense. (*People v. Lucas* (1995) 12 Cal.4th 415, 464.)

### DISPOSITION

The judgment is affirmed.


_____
SIMONS, J.


We concur.


_____
JONES, P.J.


_____
BRUINIERS, J.